UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BARBARA L. YOAP,

        Plaintiff,

        v.         Case No. 20-C-1337

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

**DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION**

Plaintiff Barbara Yoap filed this action for judicial review of a decision by the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Yoap contends that the decision of the administrative law judge (ALJ) is flawed and requires reversal for a number of reasons. For the reasons that follow, the Commissioner's decision will be affirmed.

**BACKGROUND**

Yoap filed an application for a period of disability and disability insurance benefits on October 28, 2013, alleging disability beginning January 1, 2012. R. 158–60. She listed low lumbar pain, dystonia, anxiety, dyslexia, chronic back pain, arthritis, and degenerative disc disease as the conditions that limited her ability to work. R. 175. After her application was denied initially and upon reconsideration, Yoap requested a hearing before an ALJ. ALJ Wayne Ritter held a hearing on September 7, 2016. Yoap, who was represented by counsel, and a vocational expert (VE) testified. R. 31–61.

At the time of the hearing, Yoap was 52 years old and lived with her husband in a house in Green Bay, Wisconsin. Yoap testified that she worked as bookkeeper for a grocery store until the store closed in 2009. R. 39–40. In 2012, she worked at a hair salon but left the job after two weeks because she could not understand how to use the computer system. R. 40. Yoap reported that she has had dystonia since mid-2001 and has chronic pain in her neck and shoulders. R. 41. She indicated that she takes pain medication and muscle relaxers. *Id.* Yoap testified that she was diagnosed with neuropathy in 2014 that causes chronic pain, numbness, and tingling in her legs. R. 42. She indicated that she has had concentration problems that began in 2007 but worsened in 2012. R. 42–43. Yoap reported that her degenerative disc bulge has caused lower back pain since 2009. R. 43. As to her mental impairments, Yoap testified that she has anxiety and depression. R. 45. She indicated that, with respect to her activities of daily living, she uses the telephone, watches television, plays computer games, drives, and periodically meets with her sisters. R. 44. Yoap rated her pain on an average day as a six out of ten. R. 48.

In a written decision dated November 9, 2016, the ALJ determined that Yoap was not under a disability at any time from January 1, 2012, the alleged onset date through December 31, 2014, the date last insured. R. 15–25. The Appeals Council denied Yoap's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Yoap then filed a complaint in the United States District Court for the Eastern District of Wisconsin seeking judicial review of the ALJ's decision. The matter was reversed and remanded for further proceedings on January 2, 2019. R. 674; *see Yoap v. Berryhill*, No. 17-C-1687 (E.D. Wis.).

ALJ Ritter held a second administrative hearing on July 9, 2019. Yoap, who was represented by counsel, and a VE testified. R. 630–64. At the time of the hearing, Yoap was 54 years old. Yoap testified that, since the last hearing, she had been diagnosed with carpal tunnel

2

syndrome in her right hand and that she had physical therapy for her neck. R. 637–38. She indicated that she took Amitriptyline nightly for her pain. R. 638. As to her mental health treatment since the last hearing, Yoap stated that she received treatment at Bellin Behavioral Health every two to three months. R. 639.

In a sixteen-page decision dated August 19, 2019, the ALJ concluded Yoap was not disabled. R. 601–16. Following the Agency's sequential evaluation process, the ALJ found that Yoap last met the insured status requirements of the Social Security Act on December 31, 2014, and that she did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2012, through her date last insured of December 31, 2014. R. 603. Next, the ALJ determined Yoap had the following severe impairments: disorders of the back and neck, dystonia, peripheral neuropathy, and anxiety. *Id.* The ALJ found that, through the date last insured, Yoap did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 604.

After reviewing the record, the ALJ determined Yoap had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b) but with the following limitations: "she is further limited to work involving no more than occasional climbing of ramps, stairs, ladders, ropes or scaffolds and occasional crouching; and she is limited to simple, routine, and repetitive tasks, with no fast-paced work, only simple work-related decisions, occasional workplace changes, and occasional interaction with the public and supervisors. The claimant retains the functional capacity to perform the previously-mentioned tasks, provided that she has the ability to take breaks every two hours, lasting 10 minutes each, during the regular 8-hour workday." R. 606. The ALJ found that Yoap was unable to perform any past relevant work but

3

concluded that there are jobs that exist in significant numbers in the national economy that Yoap can perform, including cleaner/housekeeper, office helper, and mail sorter. R. 614–15. Based on these findings, the ALJ determined Yoap was not under a disability at any time from January 1, 2012, the alleged onset date, through December 31, 2014, the date last insured. R. 616. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Yoap's request for review. Thereafter, Yoap commenced this action for judicial review.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the Social Security Administration (SSA) at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential.

4

*Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Assessment of Opinion Evidence

Yoap asserts that the ALJ erred in his assessment of the opinion evidence. Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Burmester*, 920 F.3d at 512; *see also* 20 C.F.R. § 416.927(c). If the ALJ decides to give lesser

6

weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he must provide a "sound explanation for his decision to reject it." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The reason for the treating physician rule is that a claimant's treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). In sum, when the opinion of a treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, it is controlling.

Dr. John Kiser treated Yoap prior to her 2012 alleged disability onset date and wrote the following letter on May 14, 2004:

> Barbara is a patient of mine, whom I have known for several years. She was unfortunately diagnosed with having dystonia in Marshfield between March and May of 2001. Since that time, she has been reasonably well and has been able to live with the disease, which causes muscle tightness, pain, and irritation in her neck, shoulders, and back area. She presently takes medication for this, which helps alleviate most of her symptoms, but with activity it seems to aggravate it and make it significantly worse. She notes that when she is overactive or does activities, even social activities, that she will get a significant amount of pain and irritation, which requires her to rest, use analgesics, and basically take it easy and not perform activities. It would be my recommendation at this point in time that Barbara avoid strenuous activities, repetitive-type jobs that would require her to move her upper neck, back, and shoulders, as well as her arms repetitively. Prolonged standing may

7

> also aggravate this if she is required to shift or twist for any length of periods of time. A sitting office-type job would be most conducive to maintaining her overall health. At this point in time, there is no cure for this disease; we can only manage it with medications. Unfortunately, as we push medications there are side effects and Barb gets side effects to these medications including drowsiness and fatigue, as well as other symptoms.

R. 317.

The ALJ gave little weight to Dr. Kiser's opinion that Yoap "needed to avoid strenuous activities, with prolonged standing also a problem." R. 613–14. He observed that these opinions and Dr. Kiser's associated treatment notes were from 2004, long before the onset date. R. 614. Yoap disagrees with the ALJ's finding that Dr. Kiser's opinion was too remote from the alleged onset date because dystonia is a chronic condition with no cure. But the ALJ explained that, while Yoap's conditions are chronic, Dr. Kiser's opinions, which were provided long before the alleged onset date, do not take into account either future degeneration or normal healing processes. *Id.*

Yoap maintains that the ALJ "offered nothing to suggest" that Yoap had actually improved since Dr. Kiser wrote the letter. Pl.'s Br. at 17, Dkt. No. 18. The ALJ noted that Dr. Kiser was not able to consider the subsequent objective medical findings, for example from Yoap's more recent treating physician, Dr. Tammy Durant, as well as other medical records, showing that Yoap had very significant functional capacity during the period under review. The ALJ reasoned that Dr. Durant treated Yoap extensively during the period in question and had a good longitudinal view of Yoap's physical condition overall, and her objective clinical findings indicate general good function. He also noted that Dr. Durant's opinions were supported by objective testing from less than one month prior to the date last insured. The ALJ concluded that substantial evidence shows that Yoap had very significant functional capacity during the period under review. R. 614. Yoap argues that the ALJ cherry-picked evidence from the record, but none of the evidence Yoap cites refutes the ALJ's conclusion that Dr. Kiser's opinions were not supported by the record. Her

8

disagreement with the ALJ's findings is not a basis for remand. Substantial evidence supports the ALJ's conclusion that Dr. Kiser's opinion was inconsistent with the evidence in the record. The ALJ created an accurate and logical bridge between the evidence and his conclusion that Dr. Kiser's opinion is entitled to little weight.

Yoap also takes the unusual position that the ALJ erred in giving controlling weight to her treating physician, Dr. Tammy Durant. She asserts that the ALJ failed to "conduct the necessary inquiry into whether Dr. Durant's opinion was inconsistent with other substantial evidence before assigning it controlling weight." Pl.'s Br. at 14. She maintains that because Dr. Kiser's opinion is inconsistent with Dr. Durant's, the ALJ should not have assigned Dr. Durant's opinion controlling weight. As explained above, however, the ALJ thoroughly explained how the opinions of Dr. Kiser and Dr. Durant were inconsistent and that Dr. Durant's opinion was supported by the substantial evidence in the record, including her own treatment notes and the December 2014 Functional Capacity Evaluation. R. 611. The ALJ also considered the extent of Dr. Durant's treatment relationship with Yoap, noting that she "treated the claimant extensively during the period in question, and had a good longitudinal view of the claimant's physical condition overall," and the fact that Dr. Kiser treated Yoap seven years before the alleged onset date. *Id.* Because the ALJ properly articulated his reasons for giving Dr. Kiser's opinion little weight, he was not bound by his opinions or findings and did not err in affording Dr. Durant's opinion controlling weight.

Yoap also argues that the ALJ improperly assigned weight to the conclusions of non-medical state agency examiners and reviewers. In February 2014, state agency reviewing psychologist Susan Donahoo, Psy.D., reviewed Yoap's medical records and noted that she was "markedly limited" in several work-related mental abilities. She opined that Yoap was incapable

of performing unskilled work. R. 73–76. The SSA's Office of Quality Review reviewed Yoap's case and determined that insufficient evidence supported Dr. Donahoo's opinion. R. 612. On April 1, 2014, the Office of Quality Review returned the case with Dr. Donahoo's assessment to the State Agency for further development and evaluation. R. 312–13. An updated mental health residual functional capacity assessment was created that found Yoap would be able to sustain unskilled work and would be capable of performing medium work, but this updated determination was not sent to Dr. Donahoo for her signature. R. 70. The ALJ gave little weight to Dr. Donahoo's February 26, 2014, determination and partial weight to the revised determination.

Yoap argues that the ALJ erroneously gave partial weight to the revised determination because the decision was the result of a "bureaucratic process and not medical judgment." Pl.'s Br. at 21. She asserts that, had the Office of Quality Review not intervened, Yoap would have been found disabled. Even if the ALJ should not have relied on the revised initial determination, such error is harmless. The ALJ adequately explained why he gave Dr. Donahoo's February 26, 2014, determination little weight and substantial evidence supports his decision.

In reaching her decision, Dr. Donahoo heavily relied on the February 11, 2014, mental status examination of Dr. Kurt Weber. Dr. Weber opined that Yoap experienced moderate limitations in the ability to understand, remember, and carry out simple instructions; moderate to marked limitations in the ability to respond appropriately to supervisors and co-workers; moderate limitations in the ability to maintain concentration, attention, and work pace; marked limitations in the ability to withstand routine work stresses; and marked limitations in the ability to adapt to changes in the work environment. The ALJ observed that Dr. Weber's mental status evaluation mainly consisted of a recitation of Yoap's allegations, rather than actual observations. He noted that the evaluation contained few clinical findings beyond that Yoap was "oriented x3." R. 612.

He explained that Dr. Weber's opinions were inconsistent with Yoap's own reports of numerous functional activities, including routinely caring for her own personal needs and performing household chores; maintaining relationships with family members and friends; leaving home to shop, attend appointments, and socialize; handling money; driving; and engaging in free-time activities like watching television, playing games on her computer and tablet, searching the internet, and shopping online. *Id.* The ALJ concluded Dr. Weber's opinions reflect an overstatement of the examination findings. Yoap does not challenge the ALJ's assessment of Dr. Weber's opinions.

The ALJ then explained that, for the same reasons given to the opinions from Dr. Weber, he gave little weight to Dr. Donahoo's February 26, 2014 opinions. He determined that there was insufficient medical documentation to support Dr. Weber's opinion and, by extension, Dr. Donahoo's assessment that Yoap would not be capable of even unskilled work. The ALJ gave significant weight to the opinion of state agency medical consultant Jan Jacobson, Ph.D., who reviewed the medical record at the reconsideration level. R. 612. Dr. Jacobson found that Yoap had mild limitations in activities of daily living; moderate limitation in social functioning; moderate limitation in concentration, persistence, or pace; and no repeated episodes of decompensation. She concluded that Yoap was not disabled. R. 91–93. The ALJ's decision is supported by substantial evidence. Therefore, remand is not warranted on this basis.

**B. Evaluation of Subjective Allegations**

Yoap also contends that the ALJ erred in evaluating her subjective symptoms regarding her physical limitations. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment

"could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c). In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR 16-3p. "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539. "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester*, 920 F.3d at 510.

The ALJ noted that Yoap alleged an inability to work due to low lumbar pain, dystonia, anxiety, dyslexia, chronic back pain, arthritis, and degenerative disc disease. R. 607. She reported that her chronic neck, shoulder, and back pain was compounded by sitting or standing for extended periods of time and that her anxiety and dyslexia made it difficult to perform normal everyday tasks and make decisions. She also alleged that her impairments cause limitations in lifting,

12

squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. *Id.* After summarizing the record, the ALJ concluded, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 610. The ALJ relied on the longitudinal treatment and medical records, Yoap's statements and reported activities, the medical opinions, and other evidence in the record. R. 606–14.

The ALJ indicated that the objective medical evidence, including the diagnostic findings and objective observations do not support severe limitations. R. 610. In finding that the medical evidence does not support severe limitations, the ALJ highlighted the diagnostic findings, "including moderate multilevel degenerative disc and facet disease but no evidence of focal herniation or significant spinal stenosis and lower extremity peripheral polyneuropathy," as well as certain objective observations, "including reduced cervical spine range of motion and some tenderness to palpation over the SI joints bilaterally, left greater than right, but also normal muscle tone, strength, reflexes, coordination, and gait." *Id.* Yoap asserts that none of the imaging studies the ALJ cites contradict her dystonia or are inconsistent with her symptoms becoming active when she engages in strenuous activity. The ALJ did not only rely on the objective medical evidence; he also analyzed the other medical evidence in the record, including the December 2014 Functional Capacity Evaluation and treatment notes, and explained how the record was inconsistent with Yoap's alleged symptoms. The ALJ determined that the medical evidence did not fully support Yoap's allegations of disabling symptoms and referenced specific parts of the record that

13

demonstrated his path of reasoning. His discussion of the medical evidence complied with the SSA's regulations and rulings regarding the evaluation of a claimant's statements about the symptoms allegedly caused by her impairments.

The ALJ noted that Yoap's work history strongly suggests that her lack of employment during the period of alleged disability is not due to an inability to work. R. 610. Yoap contends that the ALJ improperly considered her work history. An ALJ can consider information about a claimant's prior work record in assessing credibility. *See* 20 C.F.R. § 416.929(c)(3). The ALJ explained that, while Yoap was originally diagnosed with dystonia in mid-2001, her earnings record shows continued work activity through 2009. The ALJ observed that Yoap remained with the same employer during that time and worked as a bookkeeper, despite her impairment, and that the position ended only because the employer closed in 2009. R. 610–11. The ALJ stated that, although Yoap reported she later stopped working at a different bookkeeping job because she was unable to learn the computer system, he concluded the evidence would not support finding this incident indicative of an overall inability to perform all types of work activity. R. 611. He determined that Yoap's lack of employment appears to be largely due to issues other than her impairments. Yoap asserts that being unable to do unskilled bookkeeping work is entirely in keeping with the mental RFC for unskilled work the ALJ assigned. But the ALJ cited Yoap's work history as being inconsistent with the allegedly disabling physical symptoms she experienced. It was not inappropriate for the ALJ to rely on Yoap's prior work record in assessing her complaints about her physical limitations.

The ALJ indicated that Yoap's actual abilities, as shown by her activities of daily living, also suggest she is more functional than alleged. Yoap argues that the ALJ failed to explain how the activities of daily living he cites are inconsistent with her allegations regarding her inability to

maintain a position for prolonged periods. But the ALJ properly relied on her reported activities to assess the credibility of her statements concerning the intensity, persistence, and limiting effects of her symptoms. The ALJ observed that Yoap used a computer for tasks at her prior job and used her personal computer/tablet to play games/puzzles, search the internet, and shop online. He indicated that Yoap reported handling her own family finances and that the mental status examination showed she is adept with numerical issues. The ALJ stated that this "argues against pain that significantly limits an ability to concentrate." R. 611. The ALJ also observed that, in spite of any physical or mental issues experienced, Yoap reported a good range of activities of daily living in application materials and during evaluations. He noted that, with regard to mental issues, for the period through December 31, 2014, Yoap's care was limited to psychotropic medication provided by her primary care provider with no record of specific mental health treatment during that time. *Id.* The ALJ followed the regulations governing the assessment of a claimant's statements concerning her symptoms when discussing Yoap's daily activities.

The ALJ also noted that the longitudinal treatment record, consisting only of routine, conservative treatment, is not consistent with the degree of symptoms alleged through the date last insured. R. 610. The ALJ observed that Yoap was prescribed message therapy and medications, used heat and ice, and participated in physical therapy six months after the date last insured. R. 608. Yoap asserts that the ALJ failed to indicate what additional treatment would be necessary for her dystonia. She also argues that the ALJ indicated that she "did not want to attempt Botox to assist with her dystonia symptoms," *id.*, but did not consider that she did not purse Botox because of cost or state how her failure to follow through with the treatment was inconsistent with her allegations. In this case, the ALJ considered Yoap's treatment as required by SSR 16-3p. Even if the ALJ's consideration of Yoap's conservative treatment was incorrect, the error is harmless.

15

*See Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) (citation omitted); *see also Halsell v. Astrue*, 357 F. App'x 717, 722–23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are."). Even without considering whether Yoap underwent conservative treatment, the ALJ provided a number of reasons to support his evaluation of Yoap's symptoms. His assessment of Yoap's subjective statements is supported by substantial evidence, is not patently wrong, and does not necessitate remand.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of March, 2022.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge